## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**KYLE TAYLOR TREMBLAY,**<br><br>Defendant. | **CASE NO. 4:21-cr-109-JGE**<br><br><br><br>**DEFENDANT'S SENTENCING BRIEF TO BE FILED UNDER SEAL** |

## TABLE OF CONTENTS

I.   Introduction ........................................................................................................... 2
II.  Factual Background ............................................................................................... 2
III. Guidelines Range Calculation ............................................................................... 3
     A.   Sadistic or Masochistic Conduct .................................................................. 4
IV.  The court should have a policy disagreement with the sentencing guidelines ... 4
V.   A sentence of 180 months meets all the 3553(a) factors ................................. 10
     A.   History and characteristics of Mr. Tremblay ............................................ 11
     B.   Physical and mental health of Mr. Tremblay ............................................ 13
     C.   Other characteristics of Mr. Tremblay ...................................................... 14
     D.   A sentence of 180 months reflects retribution, deterrence, incapacitation, and rehabilitation ....................................................................................... 14
VI.  Conclusion ........................................................................................................... 16

1

**I.     Introduction**

Kyle Tremblay was not more culpable than the standard offender, was sexually abused as a young child, and immediately took full responsibility for the offense. Once the court accounts for the background of Mr. Tremblay, and applies the 3553(a) factors, Mr. Tremblay should receive a sentence of 180 months.

**II.    Factual Background**

On April 1, 2021, LEO received information that Kyle Taylor Tremblay was engaged in sexually explicit conversations with a minor. [PSIR ¶ 10]. On April 30, 2021, police searched Tremblay's apartment. [PSIR ¶ 10]. Tremblay admitted to meeting K.F. on Omegle, then talking on Duo, TikTok, and Snapchat. [PSIR ¶ 10]. Mr. Tremblay stated that the things on his phone would convict him, and that his phone was loaded with photos and videos which would lead to his conviction. [PSIR ¶ 10].

The police seized Mr. Tremblay's cellular phone, which he used to access Omegle. [PSIR ¶ 11]. He would then video record his screen to capture the video chat and the corresponding instant messages that were part of the Omegle session. [PSIR ¶ 11]. The screen recordings were located on Tremblay's cell phone. [PSIR ¶ 11]. In many video chats, the child is clearly a minor, states his/her age (or Tremblay comments on the minor's age), and Tremblay directs the child to do sexual things for the camera. [PSIR ¶ 11]. Tremblay is frequently masturbating during these interactions. [PSIR ¶ 11].

The government filed an indictment against Mr. Tremblay, charging him with Count 1: Production of Child Pornography in violation of 18 U.S.C. § 2251(a), 2251(e); Count 2: Production of Child Pornography in violation of 18 U.S.C. § 2251(a), 2251(e); Count 3: Production of Child Pornography in violation of 18 U.S.C. § 2251(a), 2251(e); Count 4:

Production of Child Pornography in violation of 18 U.S.C. § 2251(a), 2251(e); Count 5: Transportation of Child Pornography in violation of 18 U.S.C. § 2252A(a)(1), 2252A(b)(1); Count 6: Transportation of Child Pornography in violation of 18 U.S.C. § 2252A(a)(1), 2252A(b)(1); Count 7: Receipt of Child Pornography in violation of 18 U.S.C. § 2252A(a)(2), 2252A(b)(1); and Count 8: Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), 2252A(b)(2). [PSIR ¶ 1]. Mr. Tremblay pleaded guilty to Count Four of the indictment. [PSIR ¶ 2]. Pursuant to the written plea agreement, the government agreed to dismiss Counts One through Three and Five through Eight and to recommend a three-level reduction for acceptance of responsibility pursuant to USSG §3E1.1 at sentencing. [PSIR ¶¶ 3-4].

### III. Guidelines Range Calculation

The parties disagree on the guideline calculations. The parties agree that the base offense level is 32 pursuant to USSG §2G2.1(a).. [PSIR ¶ 20]. The parties agree that offense involved a minor who had not attained the age of twelve years so it should be increased by four levels pursuant to USSG §2G2.1(b)(1)(A). [PSIR ¶ 21]. The parties agree that the offense involved the commission of a sexual act so should be increased by two levels pursuant to USSG §2G2.1(b)(2)(A). [PSIR ¶ 22]. The parties disagree that the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence pursuant to USSG §2G2.1(b)(4)(A). [PSIR ¶ 23]. The parties agree that the offense involved the use of a computer to otherwise solicit participation by a minor in such conduct pursuant to USSG §2G2.1(b)(6)(B), but Mr. Tremblay intends to ask for a variance. [PSIR ¶ 24]. The parties agree that there should be a Chapter 4 enhancement and that the defendant engaged in a pattern of activity involving prohibited sexual conduct

3

and is a repeat and dangerous sex offender against minors pursuant to USSG §4B1.5(b)(1). [PSIR ¶ 24]. The parties agree that Mr. Tremblay should receive a three-level reduction for timely acceptance of responsibility pursuant to USSG §3E1.1. [PSIR ¶¶ 30-31]. Under Mr. Tremblay's calculations, this would make for a total offense level of 42. The parties agree that Mr. Tremblay has a criminal history category of I. [PSIR ¶ 46]. Under Mr. Tremblay's calculations, he would have a guideline imprisonment range of 360 months to life.

### A. Sadistic or Masochistic Conduct

While the Guidelines do not define the term sadistic, the 8th Circuit has held that actual or attempted penetration is sadistic. United States v. Morgan, 842 F. 3d 1070, 1076 (8th Cir. 2016). This is not a reasonable interpretation of the Guidelines. If the Guidelines wanted to increase the range because of penetration, it would be easy tow rite that enhancement. Outside of the context of child pornography, such an act would not be considered sadistic, masochistic, or violent. But other Guidelines and the crime itself already provide proper punishment for participation in child pornography. Expanding the definition of sadistic, masochistic, and violent to include all penetration does not give the Guidelines a fair reading.

### IV.     The court should have a policy disagreement with the sentencing guidelines

For all of the reasons discussed above, Tremblay asks that the court decline to use the sentencing guidelines at all as a starting point for determining a reasonable sentence in this case, because the applicable sentencing guidelines here are simply not reasonable. The court has the power to reject the guidelines on policy grounds, and it should exercise that power. Kimbrough v. United States, 552 U.S. 85 (2007).

4

Nevertheless, Tremblay makes the following objections to the sentencing guidelines calculation contained in the PSR. They must acknowledge the uniqueness of the fact of this case.

The United States Sentencing Commission has recognized since at least 2012 that its guidelines for sentencing various child pornography offenses were out of proportion with the realities of even run-of-the-mill child pornography offenses:

> The 2012 Child Pornography Report sought to contribute to the ongoing assessment by Congress and other stakeholders in the federal criminal justice system regarding the efficacy of sentences for federal child pornography offenses, particularly for non-production cases. Specifically, the 2012 Child Pornography Report evaluated the severity of offender behavior to provide a more complete understanding of non-production child pornography offenses and offenders. The Commission emphasized the seriousness of non-production offenses, noting that child pornography offenses normalize the sexual abuse of children and may promote existing tendencies toward sex offending and the production of new images. . . .
>
> The 2012 Child Pornography Report also examined sentencing outcomes and resulting disparities. The Commission explained that guideline ranges and average sentences had increased substantially since Congress passed the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today ("PROTECT") Act of 2003. Through the PROTECT Act, not only did Congress directly amend the guidelines to add new sentencing enhancements and create new statutory mandatory minimum penalties, but the underlying conduct triggering such enhancements and penalties increasingly applied to more offenders. Due to advancements in technology, enhancements that were intended to apply to the most serious child pornography offenses were routinely applied to most non-production child pornography offenders. At the same time, within range sentences were imposed in less that one-third of non production child pornography cases. . . .
>
> Based on those findings, the Commission concluded that the non-production child pornography sentencing scheme should be revised to account for technological changes in offense conduct, emerging social science research about offender behavior, and variations in offender culpability and sexual dangerousness.

USSC, Federal Sentencing of Child Pornography, Non-Production Offenses (June 2021)

5

at 1-2 (Ex. B). To fix the fact that the guidelines skewed all defendants towards the mandatory maximum, thereby failing to distinguish between offenses that were qualitatively more or less serious than others, the Commission in 2012 proposed amending the guidelines to account for three factors that would more accurately sort child pornography defendants into different guidelines based on the seriousness of their crimes. Id. at 2. Those factors were:

> (1) The **content** of the offender's child pornography collection and nature of the offender's collecting behavior; (2) the offender's degree of involvement with other offenders, particularly in an internet **community** devoted to child pornography and child sexual exploitation; and (3) the offender's engagement in sexually abusive or exploitative **conduct** in addition to the child pornography offense.

Id. at 2. The Department of Justice acknowledged after the 2012 Sentencing Commission report that changes needed to be made. The DOJ specifically acknowledged "that advancements in technology and the evolution of the child pornography 'market' have led to a significantly changed landscape – one that is no longer adequately represented by the existing sentencing guidelines. . . . we agree with the Report's conclusion that the existing Specific Offense Characteristics ('SOCs') in USSG § 2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness." Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, on Behalf of the Department of Justice, March 5, 2013, https://sentencing.typepad.com/files/doj-letter-to-ussc-on-cp-report.pdf.

Most significantly, the Second Circuit Court of Appeals has recognized that district courts will likely err if they rely on the sentencing guidelines for child pornography sentences to determine a sentence that is sufficient, but not greater than necessary. See United States v. Dorvee, 616 F.3d 174, 186-88 (2d Cir. 2010). Under the current

6

guidelines

> [a]n ordinary first-time offender is . . . likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction. Consequently, adherence to the Guidelines results in virtually no distinction between the sentence for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniarygain and who fall in higher criminal history categories. This result is fundamentally incompatible with § 3553(a). By concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and violates the principle, reinforced in Gall, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct. See Gall, 552 U.S. at 55 (affirming a sentence where 'it is perfectly clear that the District Judge considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated" (emphasis in original)).

Id. at 186-87.

A number of federal judges since 2012 have taken these concerns to heart in determining whether individual defendants were appropriately sentenced under the guidelines.

In United States v. Nash, 1 F. Supp. 3d 1240, 1241 (N.D. Al. 2014). Judge Boudre rejected the sentencing guidelines on policy grounds:

> Congress desired the Guidelines to avoid sentence disparities and, in most circumstances, the Guidelines are a good place to start in determining a sentence. In this case, however, as in Dorvee, a Guidelines sentence would generate an unreasonable result. In Gall v. United States, the Supreme Court cautioned that courts not only must guard against unwarranted sentence disparities among similar defendants, but also must consider the need to avoid unwarranted *similarities* in sentencing defendants who have been found guilty of *dissimilar* conduct. 552 U.S. 38, 55 (2007). Applying that principle here, the child pornography Guidelines do not truly reflect the kind of conduct involved in this case.

Id. at 1244-45.

7

Cases rejecting the child pornography guidelines are not limited to "sexting" offenses. In <u>United States v. Childs</u>, the district court noted that the Sentencing Commission itself had "publicly declared that the exiting guidelines for child pornography offenses were flawed and in need of repair" and that the DOJ "expressed its agreement." 976 F. Supp. 2d 981, 982 (S.D. Ohio Oct. 2, 2013). Although 145 files of suspected child pornography were present on the defendants' computer, the court imposed a sentence of 6 months imprisonment for possession of child pornography. <u>Id.</u> Likewise, in <u>United States v. Campbell</u>, 738 F. Supp. 2d 960, 961-62 (D. Neb. 2010), the court found that the guidelines did not take the qualitative differences between Mr. Campbell and other defendants into account, so the court rejected the guidelines and imposed a sentence of a 60-month probationary sentence, with strict conditions of supervision including community and home confinement. <u>Id.</u> at 976. Under the sentencing factors proposed, but not adopted, by the Commission, it is clear that the guidelines should be rejected as applied to Mr. Tremblay's case.

### a. Almost all offenders have images or videos involving infants, toddlers, or prepubescent victims.

The Commission found that in 2019, over half of child pornography offenders had images or videos of infants or toddlers, and nearly every offender (99.4%) had images or videos depicting prepubescent minors. (Ex. B at 31). Under the current guidelines system, then, nearly every offender receives a 2-level increase. Tremblay would match the 99.4% of offenders in having photos of prepubescent minors or infants. Tremblay's offense was less serious than 99.4% of child pornography offenses in this regard.

### b. Most offenders distribute child pornography.

In 2019, regardless of how the offender was charged (i.e., with distribution, receipt,

8

or possession), 68.3% of offenders distributed images of child pornography. (Ex. B at 33). For this reason, distribution offenses are punished more harshly (regardless of whether the offender is charged with distribution or merely receives adjustments to their sentencing guidelines under various provisions of USSG § 2G2.2).

### c. Tremblay is younger than the average child pornography offender.

In 2019, the average child pornography offender was 41 years old. (Ex. B at 18). Mr. Tremblay is a full ten years younger, at 31 years old. He has more of a chance for rehabilitation than the typical offender,

### d. Most offenders use a computer

As the Commission explained:

> the volume and accessibility of child pornography images had increased dramatically due to the rising use of computers, digital cameras, and internet-based technology like peer-to-peer ("P2P") file sharing programs. The changes in computer and internet technology typically used by non-production child pornography offenders rendered the sentencing scheme insufficient to distinguish between offenders with different degrees of culpability.

(Ex. B at 1). The Commission wanted to consider amendments to account for changes in technological advancements, such as : revising enhancements involving distribution and use of a computer to reflect the widespread modern use of computers and internet technologies such as P2P file sharing programs." (Ex. B at 2). In 2019, 95% of offenders were given enhancements related to their use of a computer. (Ex. B at 2). Mr. Tremblay's use of a computer hardly makes him more culpable than most other offenders.

### e. Tremblay is unlikely to reoffend.

The likelihood of recidivism for run-of-the-mill child pornography offenses is fairly low. In the same 2021 study analyzing the child pornography sentencing guidelines

9

discussed above (Ex. B), the Commission also analyzed recidivism rates of federal non-production child pornography offenders released from incarceration or placed on probation in 2015, a group of 1,093 offenders. (Ex. B. at 62-67). The study defined recidivism broadly, to include:

- An arrest that led to a conviction for a felony or qualifying misdemeanor offense;
- An arrest with no evidence of an acquittal or dismissal; or
- A reported "technical" violation of the conditions of an offender's probation or supervised release that led to an arrest or revocation.

(Id. at 63). Of the 1,093 offenders who were followed for three years, 72.4% did not show any recidivism at all. (Id. at 65). Of those who showed recidivism, the majority of new offenses were not-sex offenses and not violations of sex offender registry requirements (16%). (Id.). Only 4.3% of the 1,093 offenders committed a new sex offense, and 7.3% committed new crimes related to sex offender registry requirements. (Id.). By contrast, a Sentencing Commission study of 25,431 federal offenders released after serving a term of imprisonment or placed on a term of probation in 2005, found that nearly half of all offenders were arrested for a new offense at the end of eight years. [8] The need for a lengthy sentence to reduce recidivism among child pornography offenses is overstated even when considering run-of-the-mill offenses.

**V.    A sentence of 180 months meets all the 3553(a) factors.**

The district court's responsibility is not to impose a "reasonable" sentence, but a sentence that is sufficient, but not greater than necessary, to comply with the sentencing goals set forth in the § 3553(a) factors. United States v. Bravo, 624 F.3d 921, 924 (8th Cir. 2010). Justice requires not just consideration of the nature of the offense, but also

10

the "character and propensities of the offender." <u>Pennsylvania ex rel. Sullivan v. Ashe</u>, 302 U.S. 51, 55 (1937). The 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for…the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines…;
>
> (5) any pertinent policy statement…issued by the Sentencing Commission…;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Considering the 18 U.S.C. § 3553(a) factors, <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007), and all facts outlined in this brief, a sentence of probation would be "sufficient, but not greater than necessary," <u>see</u> § 3553(a), to comply with the purposes of sentencing.

### A. History and characteristics of Mr. Tremblay

Mr. Tremblay was horribly sexually abused as a young child. Mr. Tremblay was sexually abused by an older brother (S.T.) from the ages of approximately four to nine.

11

He reported being "sexually abused mentally" by another older brother (G.T.). G.T. was also sexually abusing a niece (R.). G.T. reportedly "penetrated R. from behind while he made her perform oral [sex] on" Mr. Tremblay. G.T. would beat Mr. Tremblay until Mr. Tremblay "submitted" to the sexual abuse. Ex. A.

When Mr. Tremblay was six or seven years old, G.T. and two cousins built a fort "made out of beds" with walls around it. R. ("4 or 5 years old" at the time), her younger brother (B.), and Mr. Tremblay were reportedly in the fort. Mr. Tremblay and R. were "fooling around [in the fort] because they'd been taught to." Mr. Tremblay and R. reportedly stopped "fooling around" when they realized they were being watched; however, G.T. and the two cousins "said they would tell if [the defendant and R.] didn't keep going." Mr. Tremblay and R. thus continued "fooling around" while the three older boys "watched and masturbated." Ex. A.

Mr. Tremblay is distressed by his attraction to adolescents. He reported that he wishes he were sexually attracted to and comfortable around adults. Ex. A. He is also disturbed by looking at child pornography. "I've tried to stop many times but I just can't. I hate myself for it, I really do." Ex. A. He several times considered seeking therapy to try and alter his sexual arousal toward minors, but that he never pursued therapy out of fear that he would be reported for his arousal pattern and behavior. Ex. A. He believes he might have engaged in his offense behavior, at least in part, because child-related sexual images and acts "seemed normal" given his childhood experiences with sex. Ex. A.

Mr. Tremblay hates this part of himself that is attracted to children. Ex. A. He wishes there were a way to change it. A therapist spoke with Mr. Tremblay about an

12

approach to preventing child sexual abuse and exploitation, in which specially trained therapists work with individuals who are sexually attracted to children but are motivated to alter that arousal pattern. Ex. A. Mr. Tremblay strongly wishes to participate in such a program, and he wants to live a normal life with a healthy adult sexuality without his current shame of attraction to minors. Ex. A.

### B. Physical and mental health of Mr. Tremblay

An evaluation gave Mr. Tremblay a DSM-5 diagnosis of Avoidant Personality Disorder as well as Other Specified Trauma- and Stressor-Related Disorder ("Other Trauma Disorder"). Ex. A. The combination of Mr. Tremblay's Avoidant Personality Disorder and Other Trauma Disorder causes him to vacillate between feelings of anger and resentment toward others and a wish to be like those other people. Ex. A. His withdrawal into fantasy life is the only way for him to experience pseudo-normalcy, given his anxiety, social awkwardness, and social rejection. Ex. A. This retreat into fantasy also provides him a sense of psychological safety.

Mr. Tremblay had several factors that increased the likelihood of him engaging in treatment, benefitting from treatment, and mitigating his risk for future sexually abusive behavior. Ex. A. One factor is that Mr. Tremblay was forthright regarding his behavior and did not minimize, justify, or attempt to obfuscate his responsibility. Ex. A. Second, Mr. Tremblay verbalized and gave the appearance of sincere shame and regret regarding his offense behavior. Ex. A. Third, Mr. Tremblay acknowledged his sexual arousal to minors, which gives him important insight that is necessary for successful treatment. Fourth, he wanted treatment aimed at reducing his sexual arousal toward children and adolescents. The public exposure of his sexual preference for children/adolescents means there is no

longer a reason to avoid therapy like he previously had been doing. Finally, Mr. Tremblay does not have a generally antisocial/criminal/psychopathic style of thinking and behaving. If he did, he would likely struggle in treatment and be more likely to reoffend.

### C. Other characteristics of Mr. Tremblay

Mr. Tremblay has had periods of long term employment. [PSIR ¶ 87]. This is his first criminal offense. [PSIR ¶ 46]. He has not received any disciplinary violations while incarcerated at the Polk County Jail. [PSIR ¶ 8].

### D. A sentence of 180 months reflects retribution, deterrence, incapacitation, and rehabilitation

Under 18 U.S.C. § 3553(a)(2), the court must consider the need for the sentence imposed, in order

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

These four considerations reflect the general penological goals of retribution, deterrence, incapacitation, and rehabilitation, respectively. See Tapia v. United States, 564 U.S. 319, 325 (2011). A sentence in excess of 180 months would be overly retributive, would serve to deter no one other than Mr. Tremblay, would overly incapacitate him, and be an excessive amount of time for his proper rehabilitation. See Tapia v. United States, 564 U.S. 319, 325 (2011).

There is no need to impose a Guidelines sentence in order to achieve retribution, reflect the seriousness of the offense, promote respect for the law, or to provide just

14

punishment for the offense. Rather, imposing the Guidelines sentence will have the opposite effect of promoting respect for the law. "[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall v. United States, 552 U.S. 38, 54 (2007).

This is especially the case with a defendant like Mr. Tremblay, who was severely sexually abused as a child. Mr. Tremblay is not culpable enough to deserve a harsher sentence than that. Giving him a Guidelines sentence will only make the public view the justice system as particularly harsh and cruel.

There is no need to impose a Guidelines sentence for deterrence reasons. Recent reviews on the scientific literature on the effect of severe sentences on deterrence of crime have found that it is it very small, and that deterrence is more likely to be found due to the certainty of capture. Aaron Chalfin and Justin McCrary, Criminal Deterrence: A Review of the Literature, 55 Journal of Economic Literature 32 (2017). This deterrence rationale makes little sense then in determining whether the court needs to impose a particular sentence. See Thompson v. Oklahoma, 487 U.S. 815, 837 (1988) (discussing the deterrence rationale, saying it is an unconvincing rationale in juvenile death penalty cases because children under age 16 will not make a cost-benefit analysis of their behavior).

It stretches the imagination to think that any sentence would serve to deter others in this case, be it a guideline range sentence or a sentence well below the guideline range. It would surprise the undersigned a great deal if this sentence received any press whatsoever. These sentences are not announced publicly in any way. Employees of the

Parrish Law Firm do not discuss their cases outside of the office. The United States District Court employees and United States Attorney's Office will know, but nobody else is really going to even know about this sentence. A harsh sentence for an addict with a troubled past like Mr. Tremblay would only send the message to the public that the sentences received do not provide justice.

It is hard to imagine that this sentence would serve to deter others in this case, be it a guideline range sentence or a sentence well below the guideline range. A 180-month sentence for Mr. Tremblay will however reflect the seriousness of his offense, promote respect for the law, and provide just punishment. A 180-month sentence will also deter Mr. Tremblay from committing any sort of crime again. A 180-month sentence would also ensure that Mr. Tremblay has changed his ways and would be the best way to protect the public from further crimes of the defendant. A 180-month sentence would also offer Mr. Tremblay an opportunity for training, medical care, and correctional treatment.

Certainly, a Guidelines sentence will not assist in Mr. Tremblay's rehabilitation. In fact, 18 U.S.C. § "3582(a) precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation." <u>Tapia v. United States</u>, 564 U.S. 319, 332 (2011). Even if the court were to consider only the negative factors, and construe all the evidence against Mr. Tremblay, a sentence of 180 months meets the aims of 18 U.S.C. § 3553.

## VI. Conclusion

Mr. Tremblay has been through a life full of sexual abuse. It is no wonder that this trauma caused his sexual disorders. Besides this, Mr. Tremblay is not more culpable than the average defendant. The court should take into account his unique circumstances that

16

make him less culpable than other defendants. A sentence of 180 months is appropriate.

                                                   **PARRISH KRUIDENIER DUNN GENTRY**
                                                   **BROWN BERGMANN & MESSAMER, L.L.P.**

                                    By:  */s/ Benjamin D. Bergmann*
                                               Benjamin D. Bergmann   AT0009469
                                               2910 Grand Avenue
                                               Des Moines, Iowa 50312
                                               Telephone: (515) 284-5737
                                               Facsimile: (515) 284-1704
                                               Email: bbergmann@parrishlaw.com
                                               **ATTORNEY FOR DEFENDANT**

### **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 17, 2022, I electronically filed the foregoing with the Clerk of Court using the ECF system and a true copy of the foregoing was served either electronically or by U.S. First Class Mail upon the following:

United States Attorney's Office - DSM
110 E Court Ave, Suite 286
Des Moines, IA 50309
515-473-9284
Fax: 515-473-9292
**ATTORNEY FOR PLAINTIFF**

Kyle Tremblay
**DEFENDANT**

                                                    */s/ Keren Guerrero*
                                                   Keren Guerrero
                                                   Legal Assistant